# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| KELLEN POWELL et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| THE CITY OF ST. ANN, ) | |
| ) | **Expedited Hearing Requested** |
| Defendant. ) | (Class Action) |
| ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I. INTRODUCTION

The named Plaintiff, Kellen Powell, is an impoverished person arrested on May 21, 2015 for traffic offenses who is currently being held in a jail cell solely because he is unable to obtain what to other people is a small sum of money. Mr. Powell has been informed by St. Ann police officers that he will be kept in jail unless he pays $650 in cash. He has also been told that, pursuant to City policy, he will be brought to court for a first appearance after a week in jail. If Mr. Powell could afford to pay that money—like many other people arrested by St. Ann and charged with the same minor offenses every day—then Mr. Powell would be released immediately.

The Supreme Court has repeatedly articulated the fundamental principle that no person can be kept in jail solely because of her poverty. Although that basic rule has been applied directly to the issue presented in this case by federal and state courts, the principle is so utterly ignored by local St. Ann officials that the jailing of people solely because they cannot pay a

small amount of money to secure their release has become a normal fact of daily law enforcement practice in St. Ann.

Keeping the poor in jail because they cannot make a monetary payment violates longstanding and fundamental principles of American law. As described in detail below, the scheme enforced by St. Ann has been rejected by the courts and by every major panel of legal experts to study the issue over the past fifty years. Because the named Plaintiff is—and because many others in his situation will continue to be—held in jail by St. Ann solely by virtue of the amount of money that they and their families have, the Plaintiff respectfully requests that this Court hold a hearing on this Motion in expedited fashion. Following that hearing, this Court should issue a preliminary order preventing the continuation of this unlawful practice as soon as possible.

## II. EMERGENCY RELIEF REQUESTED

As set forth more fully in Plaintiffs' Motion for Temporary Restraining Order, Plaintiffs therefore request that the Court enjoin Defendants from continuing to hold any current and future arrestees on money bond and instead release, subject to standard booking procedures, any other ordinance violation arrestees in its custody or who become in its custody on their own recognizance or on an unsecured bond in a manner consistent with state and federal law.

## III. THE STANDARD FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER (TRO) AND PRELIMINARY INJUNCTION

Injunctive relief is "an equitable remedy shaped to right an ongoing wrong." *Kohl Kohl v. Woodhaven Learning Cntr.*, 865 F.2d 930, 934 (8th Cir. 1989). A preliminary injunction is warranted if the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) that the movant will suffer irreparable harm in the absence of an injunction, (3) that the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the

opposing party if the injunction is issued, and (4) that an injunction would not disserve the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*).  The Plaintiffs easily satisfies each of these requirements.

Injunctive relief is necessary because Plaintiffs risk immediate harm through Defendants' actions, and risk further due process and equal protection violations. Plaintiffs have no remedy at law. They will continue to suffer irreparable harm unless Defendants' actions are enjoined. The balance of interests demonstrates that the harm to Plaintiffs from being jailed for an inability to pay a bond outweighs any injury that this injunction would inflict on Defendants. Plaintiffs have a likelihood of success on the merits, and a preliminary injunction serves the public interest.

## IV. PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE MERITS BECAUSE THE CITY'S CONDUCT VIOLATES BASIC EQUAL PROTECTION AND DUE PROCESS LAW

The rule that poverty and wealth status have no place in deciding whether a human being should be kept in a jail cell relies on some of the most fundamental principles of American law. *See Griffin v. Illinois*, 351 U.S. 12, 19 (1956) ("There can be no equal justice where the kind of trial a man gets depends on the amount of money he has."); *Douglas v. California*, 372 U.S. 353, 355 (1963) (condemning the "evil" of "discrimination against the indigent"); *Williams v. Illinois*, 399 U.S. 235, 241 (1970) ("[T]he Court has had frequent occasion to reaffirm allegiance to the basic command that justice be applied equally to all persons.").[1]

These principles have been applied in a variety of contexts in which a government sought to keep a person in jail solely because of the person's inability to make a monetary payment. *See, e.g., Tate v. Short*, 401 U.S. 395, 398 (1971) ("[T]he Constitution prohibits the State from

---

[1] *See also Tucker v. City of Montgomery*, 410 F. Supp. 494, 502 (M.D. Ala. 1976) (holding in a class action civil rights case on behalf of indigent prisoners that the City's practice of charging a monetary bond in order to exercise appellate rights violated the Fourteenth Amendment).

imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full."). In *Bearden v. Georgia,* 461 U.S. 660, 672-73 (1983), the Supreme Court explained that to "deprive [a] probationer of his conditional freedom simply because, through no fault of his own he cannot pay [a] fine … would be contrary to the fundamental fairness required by the Fourteenth Amendment."

Relying on this Supreme Court precedent, federal courts have long held that any kind of pay-or-jail scheme is unconstitutional when it operates to jail the poor. In *Frazier v. Jordan,* 457 F.2d 726, 728–29 (5th Cir. 1972), the court found that an alternative sentencing scheme of $17 dollars or 13 days in jail was unconstitutional as applied to those who could not immediately afford the payment. Because those people would be sent to jail if they could not pay the $17 fine, the local court's order of imprisonment was unconstitutional. *Id*. at 728. Put simply, *Frazier* condemned the municipal court scheme because it created a system in which "[t]hose with means avoid imprisonment [but] the indigent cannot escape imprisonment." *Id.*; *see also Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir.1977) ("To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws."), vacated as moot, 439 U.S. 1041 (1978); *see alsoUnited States v. Hines*, 88 F.3d 661, 664 (8th Cir. 1996) ("A defendant may not constitutionally be incarcerated solely because he cannot pay a fine through no fault of his own.").

The court in *United States v. Flowers*, 946 F. Supp. 2d 1295 (M.D. Ala. 2013), recently reaffirmed these principles. In *Flowers*, the court was confronted with an analogous situation: a criminal defendant faced imprisonment because he could not afford the cost of release on home confinement monitoring. The court found—as the U.S. government conceded, *id*. at 1301—that keeping a person in jail solely because he could not afford to pay for home confinement

monitoring would be "wrong" and that "the Constitution's guarantee of equal protection is inhospitable to the Probation Department's policy of making monitored home confinement available to only those who can pay for it." *Id*. at 1302.

In *Flowers*, the court began by acknowledging that "the principle that wealth and poverty have no place in sentencing decisions is nothing new." *Id. Flowers* then confronted the constitutional implications for indigent defendants of a probation department policy that required a probationer to pay the cost of electronic monitoring services. The court held that it could not put a person in jail simply because the person could not afford the cost of electronic monitoring services. *Id*. at 1301. The court recounted the fundamental federal precedent from a variety of contexts, explaining that, just as "it violates the Constitution's guarantee of equal protection under the laws to convert a fine-only sentence into a prison term based on inability to pay," it would also violate the constitution to turn a sentence of electronic monitoring into a jail sentence simply because the defendant could not afford to pay for the service. *Id*. at 1300.[2]

If poverty status has no place in determining sentencing outcomes, it has no place in pretrial release decisions. Just as it is unlawful to put a convicted person in jail because of her inability to make a monetary payment, it is unlawful to put a presumptively innocent person in

---

[2]As *Flowers* described the basic violation: "[A] defendant identical to Flowers but with a thicker billfold would receive home confinement, while Flowers would receive prison." *Id*. at 1301. Other federal district courts have consistently enforced these fundamental principles. *See, e.g.*, *United States v. Waldron*, 306 F. Supp. 2d 623, 629 (M.D. La. 2004) ("It is well established that our law does not permit the revocation of probation for a defendant's failure to pay the amount of fines if that defendant is indigent or otherwise unable to pay. In other words, the government may not imprison a person solely because he lacked the resources to pay a fine."); *De Luna v. Hidalgo County*, 853 F. Supp. 2d 623, 647-48 (S.D. Tex. 2012) ("[T]he Court finds that … before a person charged with a … fine-only offense may be incarcerated by Hidalgo County for the failure to pay assessed fines and costs, this deprivation of liberty must be preceded by some form of process that allows for a determination as to whether the person is indigent and has made a good faith effort to discharge the fines, and whether alternatives to incarceration are available."); *Brown v. McNeil*, 591 F. Supp. 2d 1245, 1260 (M.D. Fla. 2008) (granting federal habeas petition because "Petitioner did not have the ability to remain current with his supervision payments given his other financial obligations at the time," which meant that state's revocation of his conditional release constituted "an unreasonable application of clearly established federal law.").

jail for the same reason. *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978) (*en banc*); *see generally* Exhibit 1, DOJ Statement of Interest. The fundamental principles in *Flowers* thus apply equally to pretrial and than post-trial home confinement. In other words, this Court's analysis in *Flowers* would have been the same if the question was whether to jail an *innocent* defendant *prior to trial* simply because he could not afford the U.S. Probation Department's *pretrial* electronic monitoring services.[3]

Indeed, in the context of pretrial arrestees, the rights at stake are even more significant because their liberty is not diminished by criminal conviction; they are presumed innocent. Justice Douglas, writing at the onset of the successful movement to rid the federal courts of the use of the kind of poverty jailing now prevalent in St. Ann, famously set forth the fundamental question: "To continue to demand a substantial bond which the defendant is unable to secure raises considerable problems for the equal administration of the law.…Can an indigent be denied freedom, where a wealthy man would not, because he does not happen to have enough property to pledge for his freedom?" *Bandy v. United States*, 81 S. Ct. 197, 197-98 (1960).

This is the question that the former Fifth Circuit answered in *Rainwater*. The panel opinion, *Pugh v. Rainwater*, 557 F.2d 1189, 1190 (5th Cir. 1977), had struck down the Florida Rule of Criminal Procedure dealing with money bail because it is unconstitutional to keep an indigent person in jail prior to trial solely because of the person's inability to make a monetary payment. The *en banc* court agreed with the constitutional holding of the panel opinion but reversed the panel's facial invalidation of the *entire* Florida Rule. *Rainwater*, 572 F.2d at 1057. *Rainwater*'s reasoning is easy to understand and dispositive of this case. The *en banc* court held that the Florida Rule itself did not require on its face the setting of monetary bail for arrestees

---

[3]For example, if a federal magistrate judge began telling all destitute defendants at initial misdemeanor appearances in the Eastern District of Missouri that they would be jailed unless they could pay $100 cash, this Court would reverse such an order immediately.

and explained that, if such a thing were to happen to an indigent person, it would be unconstitutional. In other words, the court held that the Florida courts could not be expected to enforce the new Rule—which had been amended during the litigation in that case—in a manner that violated the Constitution by requiring monetary payments to secure the release of an indigent person. The court explained the binding constitutional principles at stake:

> We have no doubt that in the case of an indigent, whose appearance at trial could reasonably be assured by one of the alternate forms of release, pretrial confinement for inability to post money bail would constitute imposition of an excessive restraint. We do not read the State of Florida's new rule to require such a result.

*Id*. at 1058.[4] Summing up its reasoning, the *en banc* court held: "*The incarceration of those who cannot [afford a cash payment], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements.*" *Id*. at 1057 (emphasis added).[5]

St. Ann's scheme does exactly what *Rainwater* and the entire line of precedent on which it was founded reject: it carves out jail for those who cannot afford to pay the City and freedom for those who can. In no case is an indigent arrestee offered an alternative to posting an immediate payment. The City (and the State of Missouri) has determined that people committing minor offenses (like the named Plaintiff and other Class members) are eligible for immediate release after arrest. The City cannot make exercising that right to freedom contingent

---

[4]*Rainwater* further explained that it refused to require a priority to be given in all cases—including those of the non-indigent—to non-monetary conditions of release. The court noted that, at least for wealthier people, some might actually prefer monetary bail over release with certain other conditions, and that the court would not invalidate a state Rule that allowed for those other conditions in appropriate cases. *Id*. at 1057.

[5]Four circuit judges wrote a powerful dissent in *Rainwater*. Although they agreed with the constitutional principles announced by the majority that the Constitution forbids jailing the poor when they cannot afford monetary bail, they were concerned about the majority's faith in the Florida courts not to apply the new state Rule in unconstitutional ways to detain the indigent. *Id*. at 1067 ("I cannot escape the conclusion that the majority has chosen too frail a vessel for such a ponderous cargo of human rights.") (Simpson, J., Dissenting).

solely on the ability to pay small amounts of cash. *Cf. Bearden*, 461 U.S.at 667-68 (holding that "if [a] State determines a fine or restitution to be the appropriate and adequate penalty for [a] crime, it may not thereafter imprison a person solely because he lacked the resources to pay it"). St. Ann's scheme is even more irrational in that it then releases impoverished defendants for free if they have not been able to pay their cash release amount after three days. No legitimate purpose is served by such an arbitrary, cruel, and devastating policy.

Nearly forty years after *Rainwater*, these basic principles are being ignored by St. Ann. While some arrestees in St. Ann hand cash to the police and are released immediately, poor arrestees charged with the same offenses languish in a crowded jail. A City-wide system that jails the poor and frees the rich for no reason other than their wealth is not a system consistent with the "fundamental fairness," *Bearden* 461 U.S. at 673, enshrined in the Fourteenth Amendment.

### V. THE NAMED PLAINTIFF AND OTHER CLASS MEMBERS WILL SUFFER IRREPARABLE CONSTITUTIONAL HARM IF THIS COURT DOES NOT ISSUE AN INJUNCTION

Without intervention from this Court, the named Plaintiff and the class of similarly situated people that he represents will continue to suffer the serious and irreparable harm of being jailed. Imprisoning a human being in a jail cell in violation of her constitutional rights is undoubtedly an irreparable harm to her body and her mind. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

Even one additional night in jail is a harm to a person that cannot be later undone. *See, e.g.*, *United States v. Bogle*, 855 F.2d 707, 710–711 (11th Cir. 1988) (holding that the "unnecessary deprivation of liberty clearly constitutes irreparable harm"); *Wanatee v. Ault*, 120 F.Supp.2d 784, 789 (N.D. Iowa 2000) ("[U]nconstitutional incarceration generally constitutes irreparable harm to the person in such custody."); *SEC v. Bankers Alliance Corp.*, 1995 WL 317586, *3 (D.D.C.1995) ("As for the question of irreparable harm in the absence of a stay, clearly Mr. Lee will be harmed by being incarcerated."); *Lake v. Speziale*, 580 F. Supp. 1318, 1335 (D. Conn. 1984) (granting preliminary injunction requiring court to inform child support debtors of their right to counsel because unlawful incarceration would be irreparable harm); *Cobb v. Green*, 574 F.Supp. 256, 262 (W.D. Mich. 1983) ("There is no adequate remedy at law for a deprivation of one's physical liberty. Thus the Court finds the harm asserted by plaintiff is substantial and irreparable.").[6] In Mr. Powell's case, further time in jail has disastrous consequences because he is the father of ten young children who depend on him.

### VI. AN INJUNCTION WILL SERVE THE PUBLIC INTEREST AND WILL NOT HARM DEFENDANT

As numerous courts have emphasized, "It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quoting and citing cases). Overwhelming federal precedent treats the amelioration of constitutional violations to be in the public interest. *See GiovaniCarandola v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("The final prerequisite to the grant of a preliminary injunction is that it serve the public interest. Again, we agree with the district court that upholding constitutional rights surely serves the public interest."); *G & V Lounge v. Michigan Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest

---

[6] Each jailing also carries with it numerous other indignities for each Class member, including intrusive body searches and cramped, crowded, and unsanitary living conditions.

to prevent the violation of a party's constitutional rights."). It is hard to imagine anything more in the public interest than remedying clear constitutional violations. *Freedberg v. United States Dept. of Justice*, 703 F. Supp. 107, 111 (D.D.C. 1988) ("And insofar as the public interest is concerned, it was perhaps put best by another judge of this district court, in another case … who said, simply, it is in the public interest to uphold a constitutionally guaranteed right." (quotations and citation omitted); *see also, e.g.*, *Wiley Mission v. New Jersey, Dep't of Cmty. Affairs*, 2011 U.S. Dist. LEXIS 96473, at * 59 (D.N.J. Aug. 25, 2011) (granting permanent injunction against state agency in part because "requiring the Department to abide by the Constitution serves the public interest").As the Court explained in *Glatts v. Superintendent Lockett*, 2011 U.S. Dist. LEXIS 1910, at *18-19 (W.D. Pa. 2011) ("[O]ne must consider the other side of the scale of public interest, which is, having a State's employees follow the Federal Constitution is also in the public interest.").

Nor would an injunction harm the Defendant. The City already offers release to every municipal ordinance violation arrestee—but only if they can pay for it. At worst, the City would be required to do what other cities and counties throughout the country do every day: release both rich and poor after arrest without requiring the poor to sit in jail because of small cash payments that they cannot afford.

Indeed, continuing to keep impoverished arrestees in jail cells because of their poverty has significant negative consequences for the public interest. The overwhelming consensus of experts is that the City will be safer by ceasing needlessly to detain the poor. Since the original ABA Standards and *Rainwater* condemned post-arrest poverty jailing, law enforcement officials and researchers have learned even more about the negative effects of post-arrest poverty custody. The National Institute of Corrections at the Department of Justice (DOJ) has led the way in

highlighting both the unequal nature of generic bail schedules and their negative impacts on community safety. *See* United States Department of Justice, National Institute of Corrections, *Fundamentals of Bail*, at 28-29 (2014).[7] There is now overwhelming evidence that keeping indigent people in jail—even for a few days after an arrest—has terrible consequences. First, it is enormously expensive to house people in jail. Second, jailing the poor can devastate lives by disrupting stable employment and child custody arrangements. Third, even just days in jail after an arrest leads to worse outcomes for all involved by increasing poverty, hurting an arrestee's family, and making it more likely that an arrestee will recidivate.[8] *See* DOJ, National Institute of Corrections, at 24-29;[9] *see also, e.g.*, International Association of Chiefs of Police, Resolution (October 2014), 121st Annual Congress at 15-16 ("[D]efendants rated low risk and detained pretrial for longer than one day before their pretrial release are more likely to commit a new crime once they are released, demonstrating that length of time until pretrial release has a direct impact on public safety.").[10]

---

[7] *See also, e.g.*, Arnold Foundation, *The Hidden Costs of Pretrial Detention* (2013) at 3, *available at*: http://www.arnoldfoundation.org/sites/default/files/pdf/LJAF_Report_hidden-costs_FNL.pdf (studying 153,407 defendants and finding that "when held 2-3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Arnold Foundation, *Pretrial Criminal Justice Research Summary* (2013) at 5, *available at*: http://www.arnoldfoundation.org/sites/default/files/pdf/LJAF-Pretrial-CJ-Research-brief_FNL.pdf (finding that "low-risk defendants held 2-3 days were 17 percent more likely to commit another crime within two years" and that those detained "4-7 days yielded a 35 percent increase in re-offense rates.").

[8] For all of these reasons, as well as the issues of fundamental fairness that render pretrial poverty-based custody unconstitutional, opposition to the routine use of generic bail schedules has been incorporated into the policy positions of the major American law enforcement stakeholders. *See, e.g.*, National Sheriff's Association, Resolution 2012-6 ("[A] justice system relying heavily on financial conditions of release at the pretrial stage is inconsistent with a fair and efficient justice system.").

[9] A*vailable at*, http://static.nicic.gov/UserShared/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf. Summarizing the current state of research, the DOJ report, *id.* at 29, concluded:
[R]esearchers found that low- and moderate-risk defendants held only 2 to 3 days were more likely to commit crimes and fail to appear for court before trial than similar defendants held 24 hours or less. As the time in jail increased, the researchers found, the likelihood of defendant misbehavior also increased. The study also found similar correlations between pretrial detention and long-term recidivism, especially for lower risk defendants. In a field of paradoxes, the idea that a judge setting a condition of bail intending to protect public safety might be unwittingly increasing the danger to the public—both short and long-term—is cause for radically rethinking the way we administer bail.

[10] A*vailable at* http://www.theiacp.org/Portals/0/documents/pdfs/2014Resolutions.pdf.

# CONCLUSION

This case is about St. Ann jailing some of its poorest people because of their inability to pay a small amount of money. For the reasons stated above, the Court should grant the Plaintiffs' motion for emergency relief and enjoin the City from keeping the named Plaintiff and those similarly situated in jail without offering release on unsecured bond or recognizance.

Respectfully submitted,

 _/s/ Thomas B. Harvey_____
Thomas B. Harvey (MBE #61734)
ArchCity Defenders
812 N. Collins Alley
Saint Louis, MO 63102
314 482-3342


 _/s/ Alec Karakatsanis_____
Alec Karakatsanis (E.D.Mo. Bar No. 999294DC)
Equal Justice Under Law
916 G Street, NW Suite 701
Washington, DC 20001
(202)-681-2409
alec@equaljusticeunderlaw.org